VERNON F. SCHMECKPEPER, APPELLANT, V. PANHANDLE
COOPERATIVE ASSOCIATION, A CORPORATION, ET AL.,
APPELLEES.

143 N. W. 2d 113

Filed June 3, 1966. No. 36139.

Wright, Simmons & Hancock, for appellant.

Orie C. Adcock and Robert M. Harris, for appellees.

Heard before CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ., and BRODKEY, District Judge.

BROWER, J.

The plaintiff and appellant Vernon F. Schmeckpeper brought this action as stockholder, patron, and member of the defendant and appellee Panhandle Cooperative Association, a corporation. The other defendants and appellees, Masami Sakurada, Harold Morrison, Tellford Ewing, Alex Welsch, Valden Rundell, Rolland Roberts, Harvey Darnall, Adam Walter, and Ed Kennedy, are

joined with the corporation defendant as its directors.

The plaintiff will be referred to as such or as Schmeckpeper, and Panhandle Cooperative Association as the defendant or Coop.

The trial court sustained a general demurrer filed by all the defendants to plaintiff's second amended petition and dismissed the petition. The facts hereinafter set out are the allegations thereof.

Plaintiff is a stockholder, patron, and member of the defendant Coop. Plaintiff alleges he brings this action on his own behalf and seeks to maintain it as a class action for the benefit of others similarly situated also. As such he seeks to require an accounting and distribution of all the earnings and savings of the defendant which exceeds 20 percent of its capital stock, which is alleged to be required by statute, section 21-1302, R. R. S. 1943, before its amendment in 1963.

Defendant was incorporated May 6, 1942, under sections 21-1301 to 21-1307, R. R. S. 1943, as those statutes existed prior to the amendment effective on October 19, 1963. Three of those sections were then amended and as they presently exist are set forth in sections 21-1301 to 21-1303, R. S. Supp., 1963. Plaintiff has 5 shares of stock which he acquired in 1959 and has been a patron longer, the duration of that period not being alleged. On September 30, 1963, the last day of the fiscal year, before commencing suit there were 8,166 patrons owning 13,551 shares of $10 each capital stock.

Between the date of incorporation of Coop and September 30, 1963, Coop accumulated from earnings, assets of book value, after allowing for depreciation, of $1,-128,430.35 of which $614,967.59 was acquired since plaintiff became a stockholder therein.

On September 30, 1963, Coop's records indicated paid-up capital stock of $316,590 although it is alleged if its articles of incorporation and by-laws had been complied with, it should only have capital stock of $135,510, and that a surplus of 20 percent thereof would be only

$27,102. It is alleged that this capital stock and surplus is all that Coop is permitted to acquire as capital assets and that the Coop is required to pay out in cash the excess to its stockholders, members, and patrons which has not been done.

This excess, however, was listed on Coop's books as capital stock and "surplus reserve," $241,925.29; "deferred patronage refunds," $391,771.05; "capital surplus and equity reserve," $21,524.30; and "savings," $292,-129.71.

The prayer of the petition is for an accounting to the stockholders, members, and patrons of Coop for all net earnings and savings of the corporation since organization; to enter judgment in favor of plaintiff and other stockholders, members, and patrons for any sum required to be distributed under Chapter 21, article 13, R. R. S. 1943, as the same existed prior to October 19, 1963; to enjoin Coop from further using the net earnings and savings contrary to said statutes; and for an attorney's fee.

Plaintiff assigns error to the trial court in sustaining the demurrer and dismissing the proceedings.

Plaintiff first contends that section 21-1302, R. R. S. 1943, as it existed prior to the amendment in 1963, required payment in cash to the patrons of all the earnings and savings of Coop after its surplus funds equaled 20 percent of its capital stock paid. We think section 21-1301, R. R. S. 1943, throws some light on the questions before us and here set out the pertinent portions of both sections. Section 21-1301, R. R. S. 1943, provides: "Any number of persons, not less than twenty, or any number of cooperative companies, not less than five, may form and organize a cooperative corporation for the transaction of any lawful business by the adoption of articles of incorporation in the same manner and with like powers and duties as is required of other corporations except as herein provided."

Section 21-1302, R. R. S. 1943, provides: "Every such

cooperative company shall provide in its articles of incorporation: * * * (4) That the company shall set aside each year to a surplus fund not less than five per cent of the earnings or savings of the company over and above all expenses and dividends or interest upon capital stock as provided in subdivision (3) of this section, until such surplus fund equals at least twenty per cent of the capital stock paid, which surplus may be used for conducting the business of the corporation;

"(5) That the net earnings or savings of the company remaining after making the distribution provided in subdivisions (3) and (4) of this section shall be distributed on the basis of or in proportion to the amount or value of property bought from or sold to members, or members and other patrons, or of labor performed, or other services rendered to the corporation; Provided, that this subdivision shall not be so interpreted as to prevent a cooperative company from declaring patronage dividends at different rates upon different classes or kinds or varieties of goods handled; and provided further, that nothing in subdivisions (3), (4) and (5) of this section shall be so interpreted as to prevent a company from appropriating funds for the promotion of cooperation and improvement in agriculture; and

"(6) That the by-laws of the company shall give a detailed statement of the method followed in distributing earnings or savings."

It is plaintiff's contention that subsection (4) of section 21-1302, R. R. S. 1943, which directs the accumulation of a surplus fund *"until* such surplus fund equals *at least* twenty per cent of the capital stock paid" (italics supplied), not only directs the accumulation of surplus to 20 percent of the capital stock, but restricts further accumulation thereof. Plaintiff argues at length concerning the meaning of the word "until" as used in the quoted sentence. The parties cite authorities from texts and dictionaries, and cases from other jurisdictions with respect to its meaning. Plaintiff urges it is a

word of limitaton, and presupposes that when the condition following such word shall become operative, the precedent condition or status shall fail. Bud Hoard Co. v. F. Berg & Co., 137 Okl. 16, 278 P. 273. See, also, 91 C. J. S., Until, p. 509; In re Wiegand, 27 F. Supp. 725; Tolle v. Superior Court, 10 Cal. 2d 95, 73 P. 2d 607.

Defendant cites among other authorities, Webster's Third New International Dictionary of the English Language, Unabridged (1961), where it is stated on page 2513, "until" is "used as a function word to indicate continuance (as of an action, condition, or state) up to a particular time, * * * up to the time that." As so used, subsection (4) might mean: "* * * the company shall set aside * * * not less than five per cent of the earnings * * * *up to the time that* such surplus fund equals at least twenty per cent * * *."

The difference in the meanings in the authorities cited is not of great significance as applied here. It is clear that as used here, "until" describes a time after which a cessation occurs. A cessation of what? The plaintiff claims the *right* to set aside the surplus ceases; the defendant claims that the duty to set *aside* such a surplus ends. In an interpretation of the whole phrase "until such surplus fund equals *at least* twenty per cent of the capital stock paid," the words "at least" are of great significance. Defendant cites Webster's Third New International Dictionary, Unabridged (1961), defining "least" on page 1286, as the lowest in importance or position, smallest in size or degree, smallest possible. "At least" is there defined on page 1287 as "at the lowest estimate: as the minimum."

Defendant also cites certain cases from the courts of other states. The case of City of Olive Hill v. Howard (Ky.), 273 S. W. 2d 387, involved the construction of the publication of an ordinance required by law to be published for not less than 3 weeks. It was held that there was no distinction between the phrases "at least" and "not less than." The court stated: "It is to be seen

from the decision in Fisher v. Booher, supra, that a week means seven days. In the light of the above decisions, there is no distinction between 'at least' and 'not less than,' each meaning that the prescribed amount of publication is a mandatory minimum." Miller v. State ex rel. Russell, 130 Miss. 564, 94 So. 706, was an action involving the Constitution of the State of Mississippi which provided that a public school should be maintained in each school district "at least four months" during each scholastic year. In the cited case it was contended that this provision permitted the Legislature to authorize state aid for only 4 months. In rejecting this contention, the court stated: "When they (the framers of the Constitution) said 'at least four months' we understand they meant that four months was to be the minimum term; or, to put it in another way, there must be not less than four months of schooling, and, inferentially, there may be a longer term, or at least a longer term was not intended to be prohibited, either expressly or by implication." Barron v. Green, 13 N. J. Super. 483, 80 A. 2d 586, involved the time in which petitions to nominate officers were required to be filed before election. The court there quoted from 7 C. J. S. 165, as follows: "The phrases 'at least' and 'prior to' must be defined in their accepted meanings. 'At least' is an adverbial phrase meaning at the lowest estimate; at the smallest concession or claim; in the smallest or lowest degree; at the smallest number; and sometimes used in the sense of clearly. It is a phrase of emphasis, expressive of a minimum, and implies the possibility of more. Sometimes it imports uncertainty, taking its meaning from the context, and hence, under particular circumstances, has been held equivalent to 'at most,' 'at the least,' 'fully,' 'not less than,' and 'not to exceed.' "

Several cases are cited by the plaintiff which he contends are authority for interpreting the words "at least" as used in subsection (4) of section 21-1302, R. R. S. 1943,

as really, at most, or a maximum. Among them is Santow v. Ullman, 39 Del. Ch. 427, 166 A. 2d 135. The matter before the court concerned the construction of a zoning statute which directed notice to be published at least seven days before the date of the hearing in a newspaper of general circulation in the county. The question being considered was whether the court should adhere to previous rulings which had held that where a notice was directed to be given for a certain number of days, "clear days" were intended. On the question before us, the court in the cited case held: "Now, the prefixing of the phrase 'at least' before the number of days required simply means, on its face, that the specified time (e.g., seven days) is the minimum time. Suppose a statute provides that 'a minimum of seven days' notice' shall be given. Would it be contended that it required seven clear days? The only difference that we can see between 'seven days' notice' and 'at least seven days' notice' is that in the latter phrase there is the implication that a longer notice may be given if desired." Plaintiff calls attention to Warren Manuf. Co. v. Hoffman, 62 Md. 165, which did construe "at least" as used there to mean "at most." Both parties were lessees of a common owner of lands on a stream with rights to dam the stream to obtain power. Defendant's lease gave it as much land as would be flooded by a dam "at least twelve feet in height at common water mark." It built a higher dam and flooded the plaintiff's mill above. It was obvious that if the defendant's lease permitted it to build a dam of any height over 12 feet, defendant's leasehold could be increased, depending only on the height of the dam. Such a description of the land conveyed would be vague and uncertain. In construing "at least" as "at most" the court put both leases in proper perspective. We think this ruling was required by the context of the leases and the circumstances before the court, and justified that interpretation.

A review of the cases discussed and those cited which

are not discussed indicates that the ordinary and usual meaning of the term "at least" is expressive of a minimum and implies the possibility of more. Its definition in Webster's New Third International Dictionary, Unabridged (1961), we have cited. As set out in 7 C. J. S. 165, quoted in Barron v. Green, *supra,* however, in certain instances it does have a different meaning taken from the context in which it occurs, and under particular circumstances it is held to be equivalent to "at most" or "not to exceed" as contended by the plaintiff. We, however, think the usual and ordinary meaning should first be applied to the phrase as it is used in section 21-1302, R. R. S. 1943. If that is done the intent of the Legislature clearly appears to mean that a minimum surplus equal to 20 percent of the capital was to be accumulated as therein provided and that more might be provided. We do not think the usual and ordinary meaning of "at least" should be set aside by judicial construction when the context of the statute and the circumstances before the court do not require it. "A statute is not to be read as if open to construction as a matter of course. Where the words of a statute are plain, direct, and unambiguous, no interpretation is needed to ascertain the meaning. It is not within the province of a court to read a meaning into a statute that is not warranted by the legislative language. Neither is it within the province of a court to read anything plain, direct, and unambiguous out of a statute." Bachus v. Swanson, 179 Neb. 1, 136 N. W. 2d 189.

Plaintiff calls attention to this statute as it existed prior to its amendment in 1925, Laws 1921, chapter 28, section 2, page 161, which permitted the accumulation of surplus without either requiring it to be done or restricting the amount thereof, and similar provisions now contained in the subsequent amendment not applicable to the case, now appearing as section 21-1302, R. S. Supp., 1963. He argues that the Legislature by enacting the statute in 1925, Laws 1925, chapter 79, page

243, in the form presented here certainly intended to make a change. This, of course, is true but it does not follow that its purpose was, as contended by plaintiff, to restrict the accumulation of surplus. It seems more reasonable to conclude the Legislature intended to require at least a minimum surplus to be provided without restricting such accumulation further. Section 21-1301, R. R. S. 1943, hitherto set out, permits cooperative corporations to be organized without the payment of any capital. Yet section 21-1302, R. R. S. 1943, following, clearly shows such corporations are to acquire capital and that which comes from surplus is to be used in the conduct of its business. Section 21-1303, R. R. S. 1943, gives such cooperative corporations power to engage in enterprises requiring capital. We do not think the Legislature intended to condemn such corporations to mediocrity. It is apparent that the Legislature could have easily and clearly provided that only surplus to the extent of 20 percent of the capital could be set aside if it had desired. Subsection (4) of section 21-1302, R. R. S. 1943, requiring the accumulation of an amount of surplus equal to 20 percent of its paid capital stock, does not restrict the corporation from providing a greater amount.

Plaintiff further contends that under subsection (5) of section 21-1302, R. R. S. 1943, the articles of incorporation, and the by-laws of the Coop the earnings remaining after the distribution provided for in subsections (3) and (4) should annually be paid in cash to the patrons. Subsection (5), however, does not state that payment or payment in cash, as contended, shall be made. Instead it provides that the remaining earnings or savings *"shall be distributed on the basis of or in proportion* to the amount or value of property bought from or sold to members, or members and other patrons, or of labor performed, or other services rendered to the corporation; Provided, that this subdivision shall not be so interpreted as to prevent a cooperative company from

declaring patronage dividends at different rates upon different classes or kinds or varieties of goods handled; and provided further, that nothing in subdivisions (3), (4) and (5) of this section shall be so interpreted as to prevent a company from appropriating funds for the promotion of cooperation and improvement in agriculture; * * *." (Italics supplied.)

Plaintiff cites authorities from which he claims the word "distribute" means to pay in cash. Among them is the case of Stoddard v. Montgomery, 169 Neb. 252, 98 N. W. 2d 875. That case involved the apportionment of attorneys' fees in a partition action in which the court quoted from Webster's New International Dictionary which defined the word "distribute" as meaning, "To divide among several or many." A synonym for "distribute" being there stated as "divide." The quotation does not reach further. Other authorities are mentioned by each of the parties to sustain their interpretation of the word. It would appear, however, that the context of the provision being considered is determinative of its exact meaning. If as mentioned in subsection (5) of section 21-1302, R. R. S. 1943, "divide" meant to pay out in cash, as contended by the plaintiff, it would not have been necessary to add subsection (6), providing: "That the by-laws of the company shall give a detailed statement of the method followed in distributing earnings or savings."

The amended acticles of incorporation as they appeared in the office of the Secretary of State on February 27, 1962, are attached to the second amended petition as exhibit A. A copy of the amended by-laws of the corporation are attached thereto, also, as exhibit B.

Of the articles of incorporation, article IV provides that capital stock may be issued to the amount of $500,-000, divided into 50,000 shares of $10 each, but business may be commenced on not less than $3,000 being subscribed and paid. Thereafter it provides: "No dividends shall be paid on this stock. Of the savings of the Associa-

tion over and above all expenses five (5) per cent shall be set aside to a surplus fund each year until said surplus fund equals twenty (20) per cent of the paid up share capital."

Article V of these articles follows: "DISTRIBUTION OF EARNINGS. All of the patrons' net margins received by this Association shall, as received by it, belong to and be held by it for and be paid to its patrons at least annually and on the basis of their respective patronage, all as may be more particularly defined and provided in the By Laws."

Plaintiff's contentions concerning these articles quoted are much the same as those directed to the statute. He maintains the articles do not contain what is to be done with respect to the earnings over and above the amount equal to 20 percent of the capital as he has hitherto contended. He points out that the articles of incorporation, article V, provides that the earnings are to be paid to its patrons at least annually as may be provided in the by-laws. It does not, however, provide they be paid in cash. Section 21-1302, R. R. S. 1943, directs that the articles shall contain a provision concerning the accumulation of surplus, as set forth in article IV. Section 21-1302, R. R. S. 1943, does not require the articles to contain the method used in the further distribution of earnings. Article V provides that they be paid to the patrons annually but significantly states that the net margins of patrons shall *belong to the association and be held by it* and be paid to the patrons as may be more particularly defined and provided in the by-laws. Section 21-1302, R. R. S. 1943, expressly directs the articles to provide that the method of distribution be spelled out in the by-laws. The plaintiff's contention that the by-laws can be no broader or detailed than the articles of incorporation in this respect is contrary to the statute.

Referring now to the by-law, provisions respecting distribution in great detail are set out in article IV. After setting forth the costs, expenses, and charges, in-

cluding ordinary business reserves which are to be deducted from the total income, it provides the remainder shall be known as net margins. It thereafter in part states: "Section 1. * * * From this net margin five (5) per cent of the balance then remaining shall be set aside to a surplus fund each year until such surplus fund equals at least twenty (20) per cent of the paid up capital stock of the corporation. * * * The remaining net earnings or savings shall be prorated among the patrons of the corporation in proportion to the amount or value of commodities bought from or sold to the corporation or handled for them by the corporation and shall be paid to the patrons in *cash, stock, stock credits, deferred credit certificates, or certificates of participation as determined by the Board of Directors.*

"Section 2. Redemption of deferred patronage refunds may be in cash, bonds, preferred stock, common stock or stock credits, certificates of participation, other equities of the Association, or any combination thereof, as determined by the Board of Directors." (Italics supplied.)

The subject of cooperatives, including both corporate cooperatives and those formed by associations, is discussed at length in 18 Am. Jur. 2d, Cooperative Associations, beginning at page 259. The subject of revolving capital fund and equity credits which is quite common to cooperatives is set out in 18 Am. Jur. 2d, Cooperative Associations, section 15, page 275, as follows: "Statutes regulating the structure of cooperative associations, and bylaws of such associations adopted pursuant thereto, frequently provide for the retention by the association of all or a portion of the operating profit of the association in order to furnish capital for the association, and in evidence of this each member of the association is credited with his proportionate part on the books of the association, and is generally issued a certificate showing such credit. This plan is known as the revolving fund plan, or equity plan, and the credits are known

as equity credits. These credits are in effect the capital of the cooperative, and it has been said that the plan for raising capital in this way is the most equitable means by which a cooperative can acquire its capital from its patrons.

"It is well settled that equity credits allocated to a patron on the books of a cooperative do not reflect an indebtedness which is presently due and payable by the cooperative to such patron. Such equity credits represent patronage dividends which the board of directors of a cooperative, acting under statutory authority so to do, has elected to allocate to its patrons, not in cash or other medium of payment, which would immediately take such funds out of the working capital of the cooperative, but in such manner as to provide or retain capital for the cooperative and at the same time reflect the ownership interest of the patron in such retained capital." Among the cases cited under the quoted section is Clarke County Coop. v. Read, 243 Miss. 879, 139 So. 2d 639, where the rules set forth in the text are followed. It must be conceded that the Mississippi statute set forth in the cited case is more fully detailed than that now under consideration. It spells out more fully the power of a cooperative corporation to accumulate surplus, and to hold and use the funds assigned and distributed as patronage dividends after their allocation.

It is apparent from a general reading of the article concerning Cooperative Associations in 18 Am. Jur. 2d, that such corporations usually raise the capital required for the business and expansion as outlined in the section quoted from page 275. Its use in agricultural communities is quite general. It is not to be supposed that the Legislature in passing the statutes now under consideration was oblivious to the manner of development and growth of such corporations. The provisions of the statutes under consideration were enacted and should be interpreted in the light of the general development of cooperative corporations. The legislative intent, when

apparent from the whole statute, is not to be thwarted by strained and unusual interpretations of particular words not required under the circumstances, nor because the statute previously was different in detail, or that a subsequent amendment has changed it in some respects. We think when given its usual accepted meaning, the language of the statute and the intent of the Legislature are clear. We conclude that under the provisions of section 21-1302, R. R. S. 1943, a cooperative corporation, after making distribution under subsections (3) and (4) thereof, may distribute the rest of its earnings and savings by prorating them among its patrons and paying them in cash, stock, stock credits, deferred credit certificates, or certificates of participation as determined by the board of directors when its by-laws so provide.

We find on error in the trial court sustaining the demurrers and dismissing plaintiff's second amended petition, and its judgment is therefore affirmed.

AFFIRMED.