253 So.2d 777

**NATIONAL SECURITY FIRE AND CAS-
UALTY INSURANCE CO., a Corp.,**

**v.**

**David BRANNON.**

**8 Div. 32.**

Court of Civil Appeals of Alabama.

Aug. 25, 1971.

Rehearing Denied Sept. 22, 1971.

Heflin & Rosser and Gene M. Hamby, Jr., Tuscumbia, for appellant.

**320**

Robert M. Hill, Jr., Florence, for appellee.

THAGARD, Presiding Judge.

In May 1966, appellant issued to appellee a fire insurance policy on a dwelling situated in Florence, Alabama. During the term of the policy the dwelling was damaged by fire and it was stipulated that the loss was $2,000.00.

After the loss the adjuster learned that, at the time of the issuance of the policy and of the loss, the title to the dwelling was in one Lonnie Groves, a nephew of appellee David Brannon, whereupon appellant denied liability and refused to pay the claim, hence the suit that led to this appeal.

To the complaint appellant filed ten pleas, to all of which appellee demurred. The court sustained the demurrer to all except Pleas 1, 7, and 8. Plea 1 was the general issue and Pleas 7 and 8 denied that the insured had an insurable interest in the property at the time of the procurement of the policy and at the time of loss. Plaintiff joined issue and the case went to a jury. There were verdict and judgment for plaintiff for $2,088.34, which included interest at the legal rate from the time proceeds of the policy were due, if they were due at all.

The sole issue litigated, and the important issue on this appeal, was whether the insured had an insurable interest when the policy was issued and when the loss occurred. We deem it advisable that we give a short resume of the evidence upon which both parties rely.

The dwelling had been owned by David Brannon's sister, Carrie Brannon, prior to her death in the 1930's. She left one child, a son named Lonnie Groves, to whom the title to the property in question passed, under the law of descent.

After her death, according to David's undisputed testimony, he (1) helped Lonnie repair the house so as to bring it up to city building standards, (2) assessed the property in his name as administrator of his sister's estate and as guardian of Lonnie Groves, (3) paid the sewer and street assessments, (4) rented the property and used the rental to pay taxes and assessments and make repairs, and when there was any surplus he turned it over to Lonnie, (5) had not been appointed by any court as legal guardian of Lonnie Groves; also that he kept no account of receipts and disbursements or of the sums given to Lonnie and that Lonnie had rented the house a portion of the time since his return from Detroit a few years ago and that Lonnie himself had collected the rents from the tenants to whom he rented the property.

David Brannon testified in effect that he attended to nearly all matters pertaining to the dwelling at the request of his sister, made shortly before her death, and with the approval of his nephew, Lonnie Groves. Some excerpts from his testimony follow:

"Q. Go ahead and answer.

"A. She told us that she had some papers and things down in the suitcase and she wanted me to take care of everything until Lonnie got 35 years old, that he didn't have sense enough to attend to his own business, and if he didn't have sense enough—to turn it back to him when he got 35 years old, and if he didn't have sense enough to take care of it, then he never would have enough. And Lonnie never did decide to take it back over.

\*    \*    \*    \*    \*    \*

"Q. Did she say anything specifically about the house at 115 South Wood Avenue or anything after that?

"A. She said that she wanted me to take care of the house for Lonnie, for Lonnie would do away with it or something before he got old enough, that she wanted me to attend to it for her."

Later, on cross-examination, there appears this excerpt from David's testimony:

"Q. Now, when he went in the army— Lonnie had sense enough to get in the army?

"A. You don't have to have much sense to get in there. They just tell you to come in and you have got to go. He didn't have enough sense to stay out of it."

Now, we quote some excerpts from the testimony of Lonnie Groves, the holder of the legal title to the dwelling at the time of the loss:

"Q. Your mother was Carrie Brannon, is that right?

"A. Yes, sir.

"Q. And she owns [sic] the little house that you have on South Wood Avenue?

"A. Yes, sir.

"Q. Do you remember about when she died, Lonnie?

"A. In '35 or '5, maybe.

"Q. After she died, who looked after your affairs here in Florence for you?

"A. David.

"Q. Was that your uncle?

"A. Yes, sir.

"Q. And was that David Brannon sitting here with me here at the table?

"A. Yes.

"Q. And that is with your permission? You wanted him to help you look after your affairs?

"A. I left it in his charge.

"Q. And you understood that your mother had done that?

"A. Yes.

"Q. Have you ever paid any of the street assessments or the taxes on your property on 415 South Wood Avenue?

"A. I always depended on him to pay it."

From the testimony of appellee David Brannon and of his nephew, Lonnie Groves, we conclude that both David and Lonnie's mother had rather low opinion of Lonnie's business acumen and of his ability to conserve his resources, and that Lonnie himself acquiesced in the latter part of their opinion; that Lonnie's mother did request David to take charge of the dwelling after her death and manage it until Lonnie became 35 years of age; that David in good faith and with reasonable skill did her bidding; that Lonnie acquiesced in her request and approved of David's management; and the relationship of principal and gratuitous agent thereby established continued long after Lonnie became 35 years of age and through the time of the procurement of the fire insurance policy and the occurrence of the loss. We further conclude that David, being unaware of the laws of insurance and the ways of the world of commerce, failed to disclose to appellant or its agent the actual resting place of the title to the property, although we do not believe that he intended to deceive the insurance company or its agent. We further conclude that David was acting as the undisclosed gratuitous agent of his principal, and with full authority, when he applied for the policy in litigation.

The foregoing findings of fact on our part bring us to the one question of law involved, viz: May the gratuitous agent of an undisclosed principal, acting with full authority from his principal, procure in his own name a valid and enforceable policy of insurance on real estate, the title to which is in his undisclosed principal? The answer to that question depends upon whether such an agent has such an interest in the property as will amount to an insurable interest.

"Contract of insurance defined.—A contract of insurance is an agreement, expressed or implied, by which one party, for a consideration, promises to pay money, or its equivalent, or to do some act of value to the assured, upon the destruction or injury of something *in which the other party has an insurable interest.*" (Emphasis supplied.) Tit. 28, § 2, 1958 Recompiled Code of Alabama.

In support of its contention that undisclosed agency is not an insurable interest, appellant cites a number of Alabama and out-of-state cases that mainly support appellant's proposition that "The named insured in a policy of fire insurance must have an insurable interest in the property designated by the policy in order to recover under the insurance policy for a fire loss to the property." However, in all of the Alabama cases cited by appellant, there is a factual difference from the case at bar. Most of the cases cited have to do with the interpretation and application of "unconditional and sole ownership" clauses in policies, and with the doctrines of waiver and estoppel as they apply to policies void or valid at the time of issue. The policy sued upon here contains no "unconditional and sole ownership" clause, so appellant must rely on the statute (Tit. 28, § 2, supra), if it is to prevail.

On the other hand, we do not think any of the Alabama cases cited by appellee are exactly in point. In the case of North British & Mercantile Ins. Co. v. Sciandra, 256 Ala. 409, 54 So.2d 764, cited by appellee, a husband and wife were tenants in common, each of them owning an undivided interest in a mercantile building in which the husband conducted a store and delicatessen, as a means of providing a livelihood for himself and family. The husband procured an insurance policy on

the entire interest; there was loss; the carrier denied liability; and the Supreme Court held that the husband had a direct pecuniary interest, hence an insurable interest, in the entire property. The court said, inter alia, "that whatever furnishes a reasonable expectation of pecuniary benefit from the continued existence of the subject of insurance is a valid insurable interest."

There was no evidence in the case at bar that David Brannon had "any reasonable expectation of pecuniary benefit from the continued existence of the subject of insurance." He testified that from the rents collected he paid the expenses of maintaining the property and paid the balance to Lonnie. Lonnie's testimony was to the same effect. As hereinabove indicated, David was a gratuitous agent.

But, says appellee, "The next issue that arises is whether the above cited 'reasonable expectation of benefit' must inure to the insured personally or whether it can inure to him as the representative of the rights and interest of another." He answers this question in the affirmative and cites, among others, American Equitable Assur. Co. of New York v. Powderly Coal & Lumber Co., 221 Ala. 280, 128 So. 225. We have read this case carefully. The plaintiff-policyholder furnished building materials on credit to a building contractor for the remodelling of a dwelling for the widow and administratrix of the estate of a decedent who owned the dwelling at the time of his death. The court held that the plaintiff had an insurable interest, but, as far as we can discern, there was no question involved of the insured acting in a "representative capacity." However, there is a paragraph in this decision that may relate to the case at bar, and we quote:

"In this latter authority, the court was careful to guard against any infringement upon the general rule of law condemning any mere gambling element of insurance, but held this was met by the proof which showed some sort of interest in the preservation of the property. The insured is not required to have technical knowledge, but must act in good faith and show such a relation to the property as would give him some sort of interest in its preservation." (221 Ala. at page 283, 128 So. at page 226)

There is no proof in our case that the insured had any interest in the preservation of the property other than his love and affection for his nephew. We have been cited no case, and we have found none, that holds that love and affection for the true owner constitutes an insurable interest in property.

The most cogent Alabama case cited by appellee in support of his position is that of American Ins. Co. v. Newberry, 215 Ala. 587, 112 So. 195, in which case the trustees of school district No. 24, Chancellor, Alabama, route No. 1, procured an insurance policy on a school building in their district. The policy was issued to the trustees in their names, as such trustees, and the suit was brought in their capacities as trustees of the school district. The Supreme Court held that as such trustees they had a duty "to care for the property, [and] to look after the general interests of the school" and, therefore, they had an insurable interest in the property insured. The company having issued to them the policy as such trustees, evidently had full notice and knowledge of the ownership of the property; which differentiates the case from the case at bar.

Appellee also cites a Tennessee case, that of Baird v. Fidelity-Phenix Fire Ins. Co., 178 Tenn. 653, 162 S.W.2d 384. In this case, the policy was issued to "Malcolm Baird, Executor of the estate of Mrs. Mollie P. Chambers, deceased." After loss and lower court litigation, the Supreme Court of Tennessee held on appeal that although the policy contained an "unconditional and sole ownership" clause, the insurer issued the policy in the name of the executor, as such, with full knowledge of the existing controversy as to whether

or not the executor's testate had title to the property at the time of her death, and that by so doing the insurer waived the "unconditional and sole ownership" clause and was thereby estopped from denying the validity of the policy. We differentiate this case from the case at bar in that the policy was issued to the executor, as such; the suit was brought by the executor, as such; and the insurer had full knowledge of the facts pertaining to the title. There are some statements in the opinion of the Tennessee Court that, taken out of context, might seem to give support to appellee's position. For example:

> "'One having the care, custody, or possession of property for another (or others) without liability and without any pecuniary interest therein may nevertheless obtain insurance thereon for the benefit of the owner.'" (162 S.W.2d at page 391)

We do not take issue with that statement of the law, but we think that in order for it to be applicable the custodian of the property must apply for the insurance in the name of the true owner or in his name as agent, trustee, executor or administrator of the true owner; and that there must be a full disclosure to the insurer of the condition of the title.

Appellee also cites and quotes from the "leading case" of Howard F. Insurance Co. v. Chase, 72 U.S. 509, 5 Wall. 509, 18 L.Ed. 524, which was decided by the Supreme Court of Maine in 1866. In that case William Chase, one of five trustees of a Congregational Church, obtained a policy of insurance on the church property, the policy being issued to "William Chase, of Portland, Maine, payable, in case of loss, to Grenville M. Chase." The church was indebted to William Chase in the amount of $15,000.00 and he in turn was indebted to G. M. Chase, and the testimony was that William Chase procured the policy to secure his debt to G. M. Chase, which, the court held, constituted an insurable interest in William Chase. The court pointed out that the policy was written by one Munger, acting in his capacity as agent for the insurance company; that Munger was a co-trustee with William Chase of the church, wherefore, there could have been no undue concealment from the insurance company.

It seems to be settled law everywhere that a policy of insurance is void *ab initio*, unless the insured has an insurable interest in the property, and the reason for the rule most commonly assigned is that if the insured has no insurable interest in the property insured, the insured is wagering that a loss or damage to the property will occur and the insurer is wagering that it will not, thereby supplying the insured with an incentive to injure or destroy the insured property, which is against public policy.

That David Brannon acted in good faith in procuring the policy in his name, and that he fully intended to use the proceeds of the insurance to repair the damage to the dwelling if he recovered in this litigation, we doubt not. To hold that he had no insurable interest and that the policy was void would appear on its face to bring about a harsh result. Even though we think that insurance companies are entitled to a full disclosure of the facts as to the title, we do not necessarily hold that the policy would have been valid and David entitled to recover had he told the insurance company or its agent that he was in possession of the property as Lonnie's gratuitous agent. Nor do we decide whether the policy would have been valid and David entitled to recover had he been employed by Lonnie and paid for his services in caring for the property. But we confine ourselves to deciding that David himself had no insurable interest in the property, and that the answer to our question hereinabove propounded as to the validity of a policy procured in his own name by an undisclosed agent is in the negative.

That our holding under the circumstances of this case may be harsh we admit, but

it is our duty to adhere to broad principles that will result in even justice to all parties in as nearly all conceivable situations as possible. Another day there may be another uncle who is not as faithful to his trust as David and may insure his nephew's property in his own name for the sole purpose of bringing about the destruction of the property and collecting the proceeds of the insurance for his sole benefit. We should not follow or promulgate a legal principle that would provide an incentive to such faithlessness.

For the failure of the trial court to give the affirmative charge with hypothesis for defendant as requested by defendant in his requested charge Number One, and assigned as error in Assignment No. 7, the judgment of the trial court is reversed and remanded. We do not deem it necessary to discuss the other assignments of error.

Reversed and remanded.