249 So.2d 829

James B. HAMPTON et al.

v.

GULF FEDERAL SAVINGS & LOAN
ASSOCIATION.

4 Div. 339.

Supreme Court of Alabama.

June 24, 1971.

Powell & Sikes, Andalusia, for appellants James B. Hampton and Martha Posey Hampton.

W. H. Baldwin, Andalusia, for appellant Elva M. Posey.

James M. Prestwood, Andalusia and Barrow & Holley, Crestview, Fla., for appellee.

PER CURIAM.

This is an appeal from a decree of the Circuit Court of Covington County, in Equity, foreclosing a mortgage executed by James B. Hampton and wife to Gulf Federal Savings & Loan Association (hereinafter called Gulf Federal).

The suit was filed by Gulf Federal against the Hamptons and against Mrs. Elva M. Posey, who held a second mortgage on the mortgaged property.

As between Gulf Federal and the Hamptons, there was one principal issue. The mortgaged property consisted of a lot and a two-story hotel building situated thereon. The building burned after foreclosure proceedings had been instituted. The Hamptons took the position that the building was not insured in the proper amount at the time it burned as a result of the failure or negligence of Gulf Federal, the mortgagee, to keep the building adequately insured.

The trial court found that Gulf Federal " * * * was not under any duty to keep insurance in full force and effect as to protect the interest of the mortgagors * * *" The trial court's decree was in accordance with that finding.

The Hamptons have appealed and argue their assignment of error that "the Trial Court erred in relieving the appellee, Gulf Federal Savings & Loan Association, of its negligence in failing to properly insure the property covered by its mortgage."

The evidence shows that on July 27, 1963, James Hampton and wife executed a note to Gulf Federal in the amount of $20,000 and gave a mortgage to Gulf Federal on the property to which we have re-

ferred above as security for the loan. The property described in the mortgage executed by the Hamptons to Gulf Federal was not at the time of the execution of the mortgage owned by the Hamptons. That property was not conveyed to the Hamptons until August 16, 1963, on which date James F. and Elva M. Posey conveyed the property to the Hamptons. At that time the Hamptons executed a note to the Poseys in the sum of $10,000, secured by a purchase-money mortgage.

On June 14, 1965, the Hamptons executed another note to Gulf Federal, which note was in the sum of $3,500, and the debt evidenced by that note was purported to be secured by the mortgage of July 27, 1963, under the future advance clause of the last-mentioned mortgage. The note in the amount of $3,500 contained language to the effect that it was secured by the mortgage of July 27, 1963, and was made subject to the terms and conditions thereof.

The mortgage of July 27, 1963, to which we will sometimes hereinafter refer as the Gulf Federal mortgage, provided that in the event of loss the insurance proceeds were to be paid directly to the mortgagee. The mortgage obligated the mortgagors, the Hamptons, to maintain insurance under the following clause:

"3. To continuously maintain hazard insurance, of such type or types and *amounts as Mortgagee may from time to time require*, on the improvements now or hereafter on said premises, and *except* when payment for all such premiums has heretofore been made under paragraph 2 hereof to pay promptly when due any premiums therefor. All insurance shall be carried in companies approved by Mortgagee * * *. Failure of the mortgagors to effect said insurance, or to pay the premiums therefor, * * * shall give the mortgagee the right and option to declare the entire principal balance, * * * due and payable with the further option of immediately fore-

closing the mortgage for the nonpayment thereof." (Emphasis supplied)

Under paragraph two of the mortgage, the mortgagors were required to make certain payments to the mortgagee as follows:

"(a) A sum equal to the ground rents, if any, next due, plus the *premiums* that will next become due and payable on policies of fire and other hazard insurance *required* to cover the mortgaged property, * * * such sums to be held by Mortgagee *in escrow* to pay said ground rents, *premiums*, taxes, and special assessments." (Emphasis supplied)

The Hamptons originally handled the matter of hazard insurance on the hotel in compliance with the mortgage. They selected as their insurance agent Wallace Smith, who did general insurance business in Florala under the name of Smith Insurance Agency. The insurance coverage was originally for $25,000, for which a premium of $300 was charged. The premium increased over a period of time and the Hamptons went to another insurance agency, but the company with which this other insurance agency obtained coverage cancelled the policy.

In October, 1965, by mutual authorization from Gulf Federal and the Hamptons, the Smith Insurance Agency again insured the property but the coverage was for only $20,000. The $20,000 coverage was divided into two policies with two different companies, in the amount of $10,000 each. One company cancelled its policy in December, 1965, and Smith Insurance Agency obtained a replacement company for this coverage.

The Hamptons were in bad financial condition and over a period of the life of the loan, more than thirty checks from the Hamptons were returned by a bank for insufficient funds. The hotel business proved to be a bad financial investment and the Hamptons fell further and further behind in regard to their obligations to Gulf Federal under their notes and the mortgage.

In the summer of 1966, the Hamptons stated that they were ready to give up and wanted Gulf Federal to take over and operate the hotel. Gulf Federal told them that it did not want to operate the hotel and didn't want the property, but wanted to help them some way or another to save the property.

On August 30, 1966, foreclosure proceedings were instituted. Immediately thereafter, the Hamptons were served with notice of foreclosure proceedings. Without notifying Gulf Federal, the Hamptons closed the hotel down and left Alabama on September 15, 1966.

Mr. Wallace Smith, the insurance agent, notified Gulf Federal that the property was vacant and if it remained vacant for sixty days the insurance would not be valid. A Gulf Federal witness stated that it looked for the Hamptons and asked about their whereabouts in many places without success. The witness also stated that Gulf Federal had many inquiries concerning where the Hamptons could be found. Gulf Federal arranged to have the water and lights reconnected and to have a policeman live in the building to prevent the insurance from becoming invalid because of the sixty-day unoccupied clause of the policy.

Mrs. Hampton testified that they left for North Carolina on September 16, 1966, without notifying Gulf Federal and she did not know at that time whether they would ever return to Florala. She also testified that at that time she knew that if the property was unoccupied for sixty days the policy would be null and void, but stated that she thought Gulf Federal would take over the hotel in two weeks from the date of their departure.

Insurance agent Smith notified his companies about the status of this property and the circumstances of the Hamptons. In October, 1966, when the renewal came upon these policies, the proposed premiums for $20,000 coverage were $1,050 a year. At that time there was only $475 in the escrow account of the Hamptons with Gulf Federal. Gulf Federal decided to reduce the insurance coverage down to $10,000, paying $525 premium for such coverage.

Gulf Federal did not notify the Hamptons of the reduction in the insurance to $10,000 in writing or otherwise, contending that it did not know their whereabouts. The hotel building burned on October 27, 1966. Following the fire, Gulf Federal received a letter from Mr. Hampton, dated October 20, 1966, from Raleigh, North Carolina, in which Mr. Hampton admitted that they had acted very badly in leaving so suddenly and without notice. Mr. Hampton, in effect, apologized for not have written sooner, but stated that they had been trying to find jobs and a place to live. The real purpose of the letter was to inquire about who bought the place at the foreclosure sale.

Insurance agent Smith testified, in substance, that the facts that the Hamptons had been delinquent in their mortgage payments; that the property had been vacated; and that the property was of a class known as a "White Elephant," caused the risk to accelerate to the point of almost making insurance prohibitive.

Gulf Federal received $9,900 of the insurance proceeds which it credited to the outstanding loan balance of $21,373.15. The trial court determined that the remaining unpaid balance with interest and late charges was $14,901.43 at the time of the trial. The trial court also awarded the amount of $2,500 as a reasonable attorneys' fee to Gulf Federal's counsel.

Appellants contend Gulf Federal should be charged with the $10,000 reduction of insurance and that the mortgage indebtedness owed by the Hamptons should be reduced by such amount. In support of their position, the appellants cite Wade v. Robinson, 216 Ala. 383, 113 So. 246, for the principle that a mortgagee who assumes the duty of handling insurance on mortgaged property must act in good faith and must use reasonable care. In that case, the vendor under a contract to sell real proper-

ty, who had the option of handling insurance matters, exercised said option and took out fire insurance on the property being sold to the vendee, but failed to adequately describe the interest of the parties, thereby rendering the policy uncollectible. The vendor was held liable. For the same principle, the appellant also cites Boyce v. Union Dime Permanent Loan Association, 218 Pa. 494, 67 A. 766, and Warrener v. Federal Land Bank, 266 Ky. 668, 99 S.W. 2d 817.

In the *Boyce* case, *supra,* originally the mortgagor handled the insurance, but the mortgagee by agreement expressly undertook to procure the insurance and inadvertently described the wrong property. After loss of the property, the mortgagee was held liable for a breach of a duty to properly insure the property.

In *Warrener* there was no obligation on the part of the mortgagee to insure the property, but there was an option to handle the insurance, which the mortgagee undertook to exercise. The mortgagee represented to the mortgagor that insurance had been placed on the property, but actually it was not done. For such failure and misrepresentation, the court held that a cause of action was presented and that a demurrer to the bill was improperly sustained.

In the instant case, the breach of duty charged was the failure on the part of Gulf Federal to keep the hotel building adequately insured. The appellants contend that it should have been insured for $20,000 instead of $10,000. First, it is necessary to determine whether there was a duty on the part of Gulf Federal to adequately insure the building at all times. In endeavoring to answer this inquiry, the language of the mortgage should be examined. The mortgage provided that the mortgagor had the duty to carry the amount of insurance which Gulf Federal would require, which amount Gulf Federal could change "from time to time." The mortgage made no provision in express terms for Gulf Federal to provide for the

insurance. However, under paragraph two of the mortgage, the mortgagors were required to pay to Gulf Federal a sum for the premiums that will next become due and payable on the policies of fire and other hazard insurance required to cover the mortgaged property. Such money paid was placed in an escrow fund, from which payments were only made by Gulf Federal. The replacing of the insurance with Smith Insurance Agency was done by the mutual authorization of the Hamptons and Gulf Federal. Certainly there can be no doubt that the Hamptons consented to the arrangement by which Gulf Federal handled the insurance matters before the reduction took place.

In a case analogous to the instant one, Keith v. Crump, 22 Ind.App. 364, 53 N.W. 839, it was held that where the *amount and manner* of distribution of insurance were entirely *within the discretion of the mortgagee* under an express agreement that the mortgagee was to provide such insurance, no liability would be imposed upon the mortgagee for failure to procure any insurance. In that case, the action was for a breach of contract and the court found that there was no measure of damages since the amount of insurance was left entirely up to the mortgagee.

Under the language of the mortgage, the right of Gulf Federal to fix the amount of the insurance was absolutely discretionary at any time. It had the right to determine, unilaterally, the amount of the insurance and even had the right under the provisions of said mortgage to reduce the coverage to zero.

This case is unlike those cases cited by the appellants where a mortgagee undertakes to perform a nondiscretionary obligation arising from either a written agreement or an oral agreement, and such obligation is negligently carried out. Here, the language of the mortgage confers upon the mortgagee complete discretion pertaining to the amount of insurance and the right to change such amount "from time to

time." Therefore, this court holds that under the language of the mortgage, Gulf Federal was under no duty to keep insurance on the mortgaged property in the amount previously maintained. In addition to this, this court further holds that under the language of the mortgage and the facts of this case, the mortgagee was under no requirement to give the mortgagors notice of the reduction of insurance coverage. Thus, there was no error in the trial court's holding that Gulf Federal would not be charged with the $10,000 reduction in insurance coverage.

The major issue between Gulf Federal and Mrs. Elva M. Posey was whether Gulf Federal's mortgage took precedence over the Posey mortgage as to the $3,500 advance made to the Hamptons by Gulf Federal after the execution of the Posey second mortgage.

The trial court decreed, in effect, that Gulf Federal's mortgage did take precedence over the Posey mortgage as to the $3,500 advance.

Mrs. Posey, in appealing from the final decree of the trial court, made the following assignment of error, which is argued in her brief: "The Trial Court erred in making the entire indebtedness owed by James B. Hampton and Martha Posey Hampton to Gulf Federal Savings & Loan Association a first lien on the land involved in this suit."

The Gulf Federal mortgage contained a future advance clause which reads, in pertinent part:

"SECURES FUTURE ADVANCES

—And also, to secure the payment of any and all notes, liabilities, and obligations of the mortgagors, or either of them, to the mortgagee, whether as maker, endorser, guarantor or otherwise, and whether such notes, liabilities or obligations, or any of them, be now in existence or accrue or arise hereafter, * * * it being the intent and purpose of the mortgagors to secure, by this mortgage, all notes, * * * which the mortgagee may have, hold, or acquire at any time during the life of this mortgage against the mortgagors, * * *. Provided, that the total of all amounts secured hereby shall not exceed at any one time the sum of Thirty Thousand and No/100 Dollars, * * *."

The mortgage also contained a clause limiting future advances to a period of ten years from the date of the mortgage.

It is without dispute in the evidence that Gulf Federal at the time it made the $3,500 advance to the Hamptons had actual knowledge of the existence of the Posey mortgage.

The almost universal rule is to the effect that after notice of the attaching of a junior lien, the senior mortgagee will not be protected in making optional future advances under his mortgage given to secure such advances. Elmendorf-Anthony Co. v. Dunn, 10 Wash.2d 29, 116 P.2d 253, 138 A.L.R. 558; 9 Thompson on Real Property, 1958 Replacement, § 4747, at p. 397; 1 Jones on Mortgages, 8th Ed., § 452, p. 583. See Farmers' Union Warehouse Co. v. Barnett Bros., 223 Ala. 435, 137 So. 176. It has been asserted, as is shown in the dissenting opinion, that the general rule should not apply in this case because the Posey mortgage contains the following language: "This is the second mortgage and by the acceptance thereof, James F. Posey and Elva M. Posey, acknowledge that it is subordinate to a mortgage to Gulf Federal Savings and Loan Association of Crestview, Florida."

We do not see any reason why the general rule should not apply simply because the Posey mortgage shows on its face that it is subordinate to the Gulf Federal mortgage.

There is no language in Auburn Ins. Agency v. First Nat. Bank of Auburn, 263 Ala. 30, 81 So.2d 600, which can reason-

ably be said to constitute a holding to that effect. In fact, the court expressly refused to rest the decision in that case on what the writer of the opinion characterized as a limitation to the general rule when the second mortgage is expressly made subject to the first mortgage, which has provisions for optional future advances. The writer of the opinion in the *Auburn Ins. Agency* case cited 138 A.L.R. 571. We will not encumber this opinion by quoting the language found on pp. 571–572 of 138 A.L.R. to which the writer of the opinion in the *Auburn Ins. Agency* case had reference. We think it sufficient to say that a reading of the excerpts from the two cases referred to on those pages will show that neither case is authority for the proposition asserted in the dissenting opinion. We find no efficacy in the contention that when an instrument shows on its face that it is a second mortgage it must be held to be inferior to future advances made by the first mortgagee with knowledge of the existence of the second mortgage because a contrary holding would subordinate only one aspect of the second mortgage and not other aspects.

There is nothing unusual in an instrument which in effect constitutes a junior lien containing language expressly showing that it is a junior lien or a second mortgage. It is common practice.

As far as we are able to determine, no court has felt constrained by the force of such so-called logic to reach the result advocated in the dissenting opinion.

We can see no reason why the general rule should not apply in this case because of any unusual factual situation.

When the Gulf Federal mortgage was executed, Gulf Federal got no security for its loan because the Hamptons did not own the mortgaged property. In order to give Gulf Federal priority over the purchase-money mortgage executed by the Hamptons to the Poseys, language had to be incorporated in the Posey mortgage to the effect that it was subordinate to the Gulf Federal mortgage. In view of the fact that from Gulf Federal's point of view, it was at least advisable for the Posey mortgage to show that it was subordinate to Gulf Federal's mortgage, we can see no reason to engraft upon the salutary general rule an exception or limitation the like of which we have been unable to find in any opinion of any court or in any textbook or reference work.

We hold that under the facts of this case, the trial court erred in not holding that the $3,500 optional advance made by Gulf Federal, with actual knowledge of the Posey mortgage, is subordinate to that mortgage.

■ The appellants assign as error the awarding of an attorneys' fee of $2,500 to the appellee's solicitors. The appellants contend such fee was unreasonable. In fixing the amount of attorneys' fees, the trial court may call to its aid its own estimate of the value of the services. Atkinson v. Kirby, 270 Ala. 178, 117 So.2d 392. This court is unable to find that the fee was so excessive as to pronounce error in the allowance made by the trial court.

For the error pointed out above, the decree of the trial court is reversed and the cause is remanded.

Reversed and remanded.

LAWSON, SIMPSON, MERRILL, COLEMAN and HARWOOD, JJ., concur.

HEFLIN, C. J., and BLOODWORTH and McCALL, JJ., dissent.

HEFLIN, Chief Justice (dissenting):

In Auburn Insurance Agency v. First National Bank, 263 Ala. 30, 81 So.2d 600 (1955), a second mortgage was expressly made inferior to a first mortgage. One of the questions involved in that case was the

priority of advancements over the claim of a second mortgage. The opinion noted that the general rule is that "if the first mortgagee has the option by the terms of the mortgage to make future advances, and does so after a second mortgage is made and with knowledge of that mortgage, those advances are *ordinarily* subordinate to the second mortgage," citing 138 A.L.R. 566. (Emphasis supplied.) However, this Court, as then constituted, mentions limitations on that general rule. First, actual notice of the existence of a second mortgage would not subordinate advancements where the second mortgage was expressly made subject to the first mortgage which provided for such optional future advances, citing 138 A.L.R. at 571 (however, this was dictum). And second, when the first mortgagee can make optional advances independently of the consent of the mortgagor, such advances would not be subordinate, but if the mortgagee must obtain the consent of the mortgagor, the advances are subordinate, this on the theory "that by executing the second mortgage, the mortgagor has estopped himself from making an agreement or giving consent in derogation of the rights granted by the second mortgage," citing 138 A.L.R. at 572.

As noted above, the first limitation to the general rule mentioned in Auburn Insurance Agency v. First National Bank, supra, was dictum. And in the A.L.R. annotation cited by this Court as then constituted, as authority for such limitation, the supportive language of cases is indeed sparse. However, the logic for such a limitation and, in addition thereto, a motivation to refrain from disturbing dictum without sound reasons persuades me to follow it.

I attach significance to the fact that one mortgage contained express language that it was subordinate to the other mortgage. Without such language, the relevant standing of mortgages must be determined by the sequence in which the mortgages are recorded. The acceptance of a mortgage which recites that it is inferior or subordinate to another mortgage is clearly an acknowledgment and agreement by the accepting mortgagee as to which mortgage is secondary regardless of the order of recordation. Thus by expressed language, the superior designated mortgage becomes a first mortgage and the inferior designated mortgage assumes the title of a second mortgage.

The self-proclaimed inferior second mortgage is an agreement and admission that the designated first mortgage shall have priority of rights over such second mortgage. Reason and prudence demand that an agreement-bound second mortgagee ascertain the terms and provisions of the designated first mortgage. Before departing with money or property and taking security therefor in the form of a mortgage which will be expressly encumbered by superior rights, such self-acknowledged second mortgagee should determine the extent and provisions of such superior rights contained in the instrument to which by agreement his rights have been subordinated.

Where there is a clear recital that a second mortgage is subordinate to a first mortgage, I feel that such reference is applicable to all features of the first mortgage, including the "future advances" clause. To hold that a second mortgage, which recites that it is inferior to a first mortgage, is subordinate to only a few aspects of the first mortgage and not to the remainder of its features would place courts in the future in the illogical and unreasonable posture of delineating which portions of a mortgage will be subordinate and which will not. Unless otherwise stated, a second mortgage which recites its own inferiority to another mortgage must be, and is, subordinate to all the features of such other mortgage.

In the instant case, the Hamptons gave the first mortgage to Gulf Federal before the Poseys conveyed the property to the mortgagors. At the time the property was conveyed, the money loaned by Gulf Federal to the Hamptons went to the sellers, the holders of the self-denominated inferior

second mortgage. By agreement of the parties, the Poseys took a second mortgage which recited that it was subordinate to the first mortgage. The insertion of the subordination language was not just an innocuous act. Such language clearly established the priority of the mortgages under these circumstances. The first mortgage contained a limit as to the total amount, including future advances, that Gulf Federal could loan the Hamptons, as well as a time limitation during which future advances could be made. If the second mortgagees intended to make the second mortgage inferior only to a portion of the provisions of the first mortgage, excluding the future advances clause, then it would have been incumbent on them to see that such partial subordination was expressed in clear and unambiguous language.

BLOODWORTH and McCALL, JJ., concur in the above dissent.