858 So.2d 233 (2003)
Raymond CUSTER and Elizabeth Custer
v.
HOMESIDE LENDING, INC.
1011409.
Supreme Court of Alabama.
March 14, 2003.
*236 W. Lewis Garrison, Jr., and W.A. Hopton-Jones, Jr., of Garrison, Scott, Gamble & Rosenthal, P.C., Birmingham; and Cecil G. Duffee III of Duffee & Associates, Birmingham, for appellants.
John E. Goodman of Bradley Arant Rose & White, LLP, Birmingham; and John C. Englander of Goodwin Procter, LLP, Boston, Massachusetts, for appellee.
HARWOOD, Justice.
Raymond Custer and his wife, Elizabeth, sued Homeside Lending, Inc. ("Homeside"), the current holder of a mortgage on residential property owned by the Custers, as well as WNC Insurance Services, Inc. ("WNC"), an insurance provider, on November 5, 1999. WNC had entered into a "Policy of Insurance Contract" with Homeside whereby WNC would "force-place"[1] flood insurance for certain Homeside borrowers. Pursuant to this agreement, WNC agreed to bind coverage on properties encumbered by Homeside mortgages, and, if needed, to force-place flood insurance with certain underwriters. WNC had also entered into a "Servicing Agreement" with Homeside pursuant to which WNC agreed to provide flood audit services[2] and Homeside agreed to purchase from WNC flood insurance Homeside forced-placed on the mortgages it serviced.
The action was filed as a class action pursuant to Rule 23, Ala. R. Civ. P., on behalf of a class of persons who, within the six-year period preceding the filing of the complaint, had had a mortgage loan serviced by Homeside and had had flood insurance force-placed under a WNC policy in an amount that exceeded the outstanding balance of their loans. As finally amended, the Custers' complaint sought compensatory and punitive damages on claims of breach of contract, unjust enrichment, breach of duty of good faith and fair dealing, negligence, fraud by suppression, breach of a duty to a third-party beneficiary, and breach of an implied contract.
Homeside filed a motion for a summary judgment as to all claims with supporting evidentiary materials. The Custers filed a response and later filed a supplemental response. WNC then filed its own motion for a summary judgment, without opposition from the Custers, which the trial court granted.[3] Thereafter, the trial court entered a partial summary judgment in favor of Homeside on all claims except the Custers' breach-of-express-contract claim and third-party-beneficiary claim, without stating its reasons for denying the summary-judgment motion as to those claims. Homeside then filed a "Motion for Reconsideration and Renewed Motion for Summary Judgment" on the breach-of-express-contract and third-party-beneficiary claims. Subsequently, the trial court reconsidered Homeside's summary-judgment motion and, again without stating a rationale, entered a summary judgment on the *237 case action summary sheet in favor of Homeside as to those claims as well. The trial court also denied class certification of the Custers' claims. The Custers then appealed.
The record reveals that the Custers own a residence in Birmingham, Alabama, which they purchased in 1970, executing a purchase-money mortgage for $18,150 to Cobbs, Allen & Hall Mortgage Company, Inc. ("Cobbs, Allen & Hall"), located in Birmingham. The mortgage did not require the Custers to maintain flood insurance on the mortgaged property. However, the mortgage contained the following relevant provisions:
"THIS MORTGAGE IS MADE, however, subject to the following covenants, conditions, and agreements, that is to say:
". . . .
"7. That [the Mortgagor] will keep the improvements now existing or hereafter erected on the mortgaged property, insured as may be required from time to time by the Mortgagee against loss by fire and other hazards, casualties and contingencies in such amounts and for such periods as may be required by the Mortgagee and will pay promptly, when due, any premiums on such insurance provision for payment of which has not been made hereinbefore.
"8. If the Mortgagor fails to insure said property as hereinabove provided, or to pay all or any part of the taxes or assessments levied, accrued, or assessed upon or against said property of the indebtedness secured hereby, or any interest of the Mortgagee in either, or fails to pay immediately and discharge any and all liens, debts, and/or charges which might become liens superior to the lien of this mortgage, the Mortgagee may, at its option, insure said property and/or pay said taxes, assessments, debts, liens, and/or charges, and any money which the Mortgagee shall have so paid or become obligated to pay shall constitute a debt to the Mortgagee additional to the debt hereby specially secured, shall be secured by this mortgage, shall bear legal interest from the date paid or incurred, and, at the option of the Mortgagee shall be immediately due and payable."
(Emphasis added.) The record also shows that Homeside's loan-servicing portfolio consists of loans it originated as well as loans it acquired from other entities, many of which date back to the 1970s. Thus, there is no single standard form mortgage in Homeside's portfolio.
The Custer loan was transferred several times to various mortgage-loan-servicing companies over the course of its life; it was transferred to Homeside in 1989. At Homeside, the Custer loan became subject to the audits of Homeside's loan portfolio designed to determine if any of the properties in the portfolio were within a special flood hazard area ("an SFHA"). In the case of the Custers' loan, WNC used the services of Z.C. Sterling Corporation ("Sterling"), a company that sometimes conducted independent audits on properties in Homeside's loan portfolio. Once Sterling determined that a Homeside property was within an SFHA, it would notify WNC electronically, and a "binder"[4] *238 would be issued, to be later converted into a policy. In accordance with the "Policy of Insurance Contract" WNC had with Homeside, WNC would provide a binder, and if necessary, place the force-placed flood insurance with certain underwriters. The flood insurance force-placed on the Custers' property was issued and bound pursuant to the "Policy of Insurance Contract" between Homeside and WNC. The "Servicing Agreement" between Homeside and WNC had no connection to the flood insurance that was force-placed on the Custers' property. As stated in the deposition of Ofelia Chuante, the senior vice president in charge of compliance, underwriting and claims for WNC, during the period between 1993 and 2000, WNC issued approximately 6,000 force-placed flood-insurance policies on properties encumbered by mortgages serviced by Homeside as a result of Sterling's audits.
Homeside executed a separate servicing agreement directly with Sterling, then known as American Sterling, on June 4, 1994.[5] Pursuant to the terms of that agreement, Sterling notified WNC that the Custers' property was deemed to be within an SFHA so that a binder could be issued.[6]
Sterling sent notification letters to the Custers in April, May, and June 1999. The April 1999 letter, written on Homeside letterhead and as required by the National Flood Insurance Act, 42 U.S.C. § 4001 et seq. ("the NFIA"),[7] stated, in pertinent part:
"Dear R M Custer,
"We recently completed a review of your loan file to ensure that our information is complete and accurate. Unfortunately, we found that your file does not contain a current flood insurance policy.
"Please help us to complete your file by giving us a copy of your current policy, or providing the information requested on the attached form within the next 60 days."
(Emphasis in original.)
The Custers received a second letter, also written on Homeside letterhead, regarding flood insurance in May 1999; that letter stated, in relevant part:
"Dear R M Custer,
"About a month ago, you were notified by letter that your property is located in a federally-designated Special Flood Hazard Area (SFHA).[[8]] Our mortgage loan guidelines and/or federal law require you to purchase flood insurance. Our letter further advised that if you did not respond within 60 days, we would purchase our own flood insurance and charge you for our premium and a non-refundable service charge of $50.00, pursuant to the terms of your loan documents.

*239 "Please note that we have not received an adequate response to our letter. Unless we receive a response within the next 30 days, we will purchase our own insurance and you will be charged accordingly. If you purchase your own insurance after the 30 day period, we will cancel our insurance and charge you only a prorated premium for the time our insurance was in effect.
"If you have not already purchased flood insurance, we encourage you to contact your local insurance agent. In most cases, your agent can provide insurance at the lowest cost available through the National Flood Insurance Program.
". . . .
"NOTICE: IF WE MUST PURCHASE OUR OWN FLOOD INSURANCE BECAUSE OF YOUR FAILURE TO RESPOND TO THIS NOTICE, THE COST OF OUR INSURANCE MAY BE SIGNIFICANTLY HIGHER THAN THE COST OF INSURANCE PURCHASED THROUGH YOUR OWN AGENT. IN ADDITION, COVERAGE FOR YOUR PERSONAL PROPERTY CAN ONLY BE PURCHASED THROUGH YOUR AGENT."
(Boldface in original.) The letter also contained a section that stated "Required Flood Insurance Amount: $79,000."
Thereafter, the Custers contacted their insurance agent in an effort to procure flood insurance. However, as Ms. Custer testified in her deposition, the agent failed to procure the requested insurance within the 60-day time limit set by Homeside in its April 1999 letter to the Custers.
In late June 1999, the Custers received a third letter written on Homeside letterhead; that letter stated that Homeside had procured flood insurance on the Custers' property as required by the mortgage agreement and by federal law.[9] The letter explained that Homeside had procured flood insurance on the mortgaged property in the amount of $79,000; that the annual premium was $667; and that that premium and a $50 nonrefundable service charge would be deducted from the Custers' escrow account or billed to them. At the time Homeside force-placed the flood insurance on the Custers' property, the outstanding loan balance was approximately $2,000. The insurance policy, obtained through WNC, stated, in pertinent part:
"A. Insurable Interest and Limit of LiabilityIt is understood and agreed that this Policy covers the insurable interest of the Insured and the Owner of the Dwelling, notwithstanding the insurable interest of any other person or persons in the Described Location."
(Emphasis added.)
Subsequent to receiving this letter, the Custers decided to pay off the outstanding balance of their mortgage loan. In July 1999, they calculated the remaining balance and submitted to Homeside a check in the amount of $1,700.32. The complaint filed by the Custers in this action states that after receiving the Custers' check, Homeside responded by letter, stating that in order to pay off the loan balance, the Custers would have to pay an additional $938.22 for hazard disbursement, which included $667 as the annual premium for flood insurance. The complaint also states that in "late July 1999," the Custers made a "regular" payment in the amount of *240 $205.67 on the loan. Several weeks later, as also indicated by the complaint, the Custers received a letter from Homeside stating that the amount necessary to satisfy the loan would be $197.98, which included earned premiums to date on the force-placed flood-insurance policy.
In an August 4, 1999, notice from WNC, the Custers were informed that the force-placed insurance had been in effect on their property from April 21, 1999, to July 20, 1999, and that premiums of $214.02 had accrued on the policy. Thereafter, the Custers mailed a cashier's check, on or about September 27, 1999, to Homeside in the amount of $213, which, the Custers assert in their complaint, paid the loan in full.[10]
The Custers state in their initial brief to this Court that an understanding of the procedures and policies Homeside uses for determining the amount of insurance it chooses to force-place on the property of its borrowers is essential to their claim. The general procedure used by Homeside for determining the amount of flood insurance it force-places, as explained by the deposition testimony of Shelly Ward, a Homeside representative, takes into account the amount of hazard insurance the homeowner has in effect on the mortgaged property and the outstanding balance on the loan and uses the greater of the two as the amount of insurance coverage to be force-placed. In an affidavit, Donna Perry, a vice president at Homeside, attested, somewhat in contrast to the procedure described by Ward, that Homeside's policy is to obtain flood insurance in the same amount as the borrower's last known hazard insurance; if, however, the amount of hazard insurance is unknown, then the amount of force-placed flood insurance is equal to the outstanding loan balance. Perry explained that this policy is premised on the assumption that a borrower would want the same amount of protection against floods as against other hazards. In this case, in accordance with its policy, Homeside force-placed $79,000 worth of flood insurance on the mortgaged property because the Custers' had $79,000 in hazard insurance on the property.
On appeal, the Custers first contend that the trial court committed reversible error in entering a summary judgment in favor of Homeside on their breach-of-express-contract claim because, they say, Homeside breached the mortgage agreement between it and the Custers, and similar mortgage agreements with putative class members, by force-placing flood insurance in amounts that exceeded outstanding mortgage loan balances, in violation of the NFIA. They secondly assert that they and the putative class members are third-party beneficiaries to the Homeside-WNC security agreement with respect to the insurance covering their equities in the insured properties, and therefore that they have standing to sue for breach of that agreement because, they argue, Homeside purchased excessive flood insurance. Further, the Custers contend that the trial court exceeded its discretion in denying class certification on their claims because, they say, all the requirements of Rule 23(a) and (b)(3), Ala.R.Civ.P., have been met. They make no argument on appeal as to their other claims.
Our review of a summary judgment is de novo.
"In reviewing the disposition of a motion for summary judgment, `we utilize *241 the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993) [overruled on other grounds by Bruce v. Cole, 854 So.2d 47 (Ala.2003) ]; Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).
In this case, the significant facts are not in dispute. We consider both the applicable provisions of the NFIA and the terms of the mortgage agreement to determine whether Homeside was entitled to judgment as a matter of law as to the Custers' claims.
Section 4012a(b) of the NFIA, "Requirement for mortgage loans," which establishes the amount of flood insurance a borrower must maintain on property designated as being within an SFHA, before a lender may extend a loan secured by the property, states, in relevant part:
"(1) Regulated lending institutions
"Each Federal entity for lending regulation... shall by regulation direct regulated lending institutions not to make, increase, extend, or renew any loan secured by improved real estate or a mobile home located or to be located in an area that has been identified by the Director [of the Federal Emergency Management Agency] as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 ..., unless the building or mobile home and any personal property securing such loan is covered for the term of the loan by flood insurance in an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act with respect to the particular type of property, whichever is less."[11]
(Emphasis added.) Section 4012a(e) of the NFIA, which grants a lender the statutory authority to force-place flood insurance on a borrower, states, in pertinent part:
"(1) Notification to borrower of lack of coverage
"If, at the time of origination or at any time during the term of a loan secured *242 by improved real estate or by a mobile home located in an area that has been identified by the Director [of the Federal Emergency Management Agency] (at the time of the origination of the loan or at any time during the term of the loan) as an area having special flood hazards and in which flood insurance is available under the National Flood Insurance Act of 1968 ..., the lender or servicer for the loan determines that the building or mobile home and any personal property securing the loan is not covered by the flood insurance or is covered by the insurance in an amount less than the amount required for the property pursuant to paragraph (1), (2), or (3) of subsection (b)[12] of this section, the lender or servicer shall notify the borrower under the loan that the borrower should obtain, at the borrower's expense, an amount of flood insurance for the building or mobile home and such personal property that is not less than the amount under subsection (b)(1) of this section, for the term of the loan.
"(2) Purchase of coverage on behalf of the borrower
"If the borrower fails to purchase flood insurance within 45 days after notification under paragraph (1), the lender or servicer for the loan shall purchase the insurance on behalf of the borrower and may charge the borrower for the cost of premiums and fees incurred by the lender or servicer for the loan in purchasing the insurance."
(Emphasis added.)
The Custers urge this Court to follow the reasoning of the Louisiana Court of Appeals in Norris v. Union Planters Bank, 739 So.2d 869 (La.Ct.App.1999) that the NFIA establishes a maximum amount of flood insurance a mortgagee may force-place on a mortgagor. In Norris, the mortgagors were obligated, pursuant to the terms of a mortgage agreement with the mortgagee, to maintain flood insurance on the mortgaged property after it was determined that the property was within an SFHA. That determination was made several years after the parties entered into the mortgage agreement; upon the mortgagor's failure to procure flood insurance following appropriate notices, the mortgagee, in accordance with 42 U.S.C. § 4012a(e)(2), force-placed flood insurance on the mortgaged property in the amount of $121,000, although the original amount of the mortgage loan was $74,750 and the loan balance at the time of the force-placement was $60,913.56. The mortgagors sued, seeking a declaratory judgment, and challenging the amount of coverage, because it exceeded the outstanding balance of the loan. The trial court entered a summary judgment in favor of the mortgagee; the mortgagors appealed. They contended that 42 U.S.C. § 4012a(b)(1) limited the amount of insurance that might be force-placed to "`an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act with respect to the particular type of property, whichever is less,'" Norris, 739 So.2d at 873 (quoting 42 U.S.C. § 4012(a)(b)(1)). Consequently, they argued, the mortgagee's procurement of insurance coverage in the amount of $121,000, despite the fact that the outstanding balance of their loan was only *243 $60,913.56, violated the NFIA. The Louisiana Court of Appeals stated:
"The limited jurisprudence on this subject guides our determination of this issue. As the United States Seventh Circuit Court of Appeals commented:
"`[A]n analysis of the legislative history and purpose indicates that the primary purposes behind the Flood Program was to diminish, by implementation of sound land use practices and flood insurance, the massive burden on the federal treasury of escalating flood disaster assistance. Federally supervised mortgage lenders also benefit, especially from the requirement of Section 4012a(b) that borrowers purchase flood insurance in the amount of the loan. It is obvious that Congress also intended borrowers to benefit from both Section 4012a(b) and the notice provision of Section [4104a], but the Flood Program is primarily concerned with protecting the federally supervised and insured lenders since the flood insurance purchase requirement of Section 4012a(b) extends only to the amount of the outstanding loan balance and not the borrower's equity.'
"Mid-America National Bank of Chicago [v. First Savings & Loan Ass'n of South Holland ], 737 F.2d [638] at 642-43 [(7th Cir.1984) ].
"Accordingly, we find as a matter of law, Union Planters purchased more flood insurance than they were authorized to purchase under the Act. We disagree with Union Planters' assertion that the Act establishes a minimum threshold of insurance coverage, but rather, our interpretation of the Act is consistent with the federal courts in Mid-America National Bank of Chicago, 737 F.2d at 642-43, and Hofbauer v. Northwestern National Bank of Rochester, Minnesota, 700 F.2d 1197, 1200 (8th Cir.1983), which find that flood insurance under 42 U.S.C.A. § 4012a(b) requires flood insurance for the amount of the outstanding loan balance and not the equity of the borrower."
739 So.2d at 874. The Norris court relied on two federal cases for "guidance" in reaching the conclusion that the NFIA establishes a maximum amount of insurance coverage that a lender could force-place on a borrower. Accordingly, we also examine those two cases.
In Mid-America National Bank of Chicago v. First Savings & Loan Association, 737 F.2d 638 (7th Cir.1984), 11 plaintiffs sued 27 federally chartered or insured commercial banks and savings and loan associations. The plaintiffs' theory of liability against the defendants was summarized as follows:
"Plaintiffs claim that defendants violated 42 U.S.C. § 4104a by failing to notify plaintiffs of the flood risk when plaintiffs acquired their loans, and that defendants violated 42 U.S.C. § 4012a(b) by failing to require plaintiffs to purchase flood insurance to the extent of the loan amounts. Plaintiffs' property suffered flood damage, and plaintiffs assert their losses were uninsured. Although the above provisions do not expressly create a federal cause of action in favor of borrowers against mortgage lenders, plaintiffs seek to hold defendants liable for losses and claim that an implied private right of action exists under Section 4012a(b) and 4104a of the Flood Program."
737 F.2d at 639.
In the process of its analysis, the United States Court of Appeals for the Seventh Circuit reviewed the sequential federal legislation establishing and refining the flood insurance program. The court concluded that "an analysis of the legislative history *244 and purpose indicates that the primary purpose behind the Flood Program was to diminish, by implementation of sound land use practices and flood insurance, the massive burden on the federal treasury of escalating federal disaster assistance." 737 F.2d at 642 (footnote omitted). The opinion noted the findings of a report of the House of Representatives explaining the purposes and objectives of the federal flood program:
"`Heavy losses over the years from hurricanes in the coastal areas and from storms in inland areas of the Nation dramatize the lack of insurance protection against flood damage. Insurance protection against the risk of destruction caused by tornados and other natural catastrophes is generally available, but it is not available against the risk of flood loss.
"`Communities along the seacoast or in a river basin become completely immobilized following a major flood. Usually they must depend on the Federal Government and voluntary relief agencies to provide various forms of assistance. Some State and local governments have limited programs to assist a flood-stricken area, but disaster relief from all of these sources is inadequate to provide for the necessary restoration of heavily damaged areas. These facts underline the need for a program which will make insurance against flood damage available, encourage persons to become aware of the risk of occupying the flood plains, and reduce the mounting Federal expenditures for disaster relief assistance.' (emphasis added [in Mid-America])."
737 F.2d at 643 n. 9 (quoting H.R. Report No. 1585 (1968)).
The court concluded that no implied federal private cause of action existed under the circumstances of the case. As a part of its analysis, the court correctly noted that the "flood insurance purchase requirement of Section 4012a(b) extends only to the amount of the outstanding loan balance and not the borrower's equity." 737 F.2d at 643 (emphasis supplied). This is not the same, however, as saying that the requirement, which Section 4012a(b) phrases in terms of being "in an amount at least equal to" the loan balance or the maximum coverage available under the Act, sets a ceiling as opposed to a floor. In fact, given that the "primary purpose" of the flood-program legislation is to reduce the massive burden on the national treasury resulting from escalating federal expenditures for flood-disaster relief assistance, it can be logically argued that Congress would not be adverse to the contractual procurement of force-placed insurance covering the full value of the property. After all, the obligation borne by the federal treasury for flood-disaster relief assistance to homeowners of properties damaged or destroyed by flooding may well extend beyond the balance of any mortgage loan encumbering them. See Peal v. North Carolina Farm Bureau Mut. Ins. Co., 212 F.Supp.2d 508, 513 (E.D.N.C.2002)(discussing the federal caselaw recognizing that under federal emergency management programs, "the federal treasury pays all flood insurance claims exceeding the revenue earned by [private insurance] companies from premium collection").
In Hofbauer v. Northwestern National Bank of Rochester, 700 F.2d 1197 (8th Cir.1983), cited by Norris, supra, and Mid-America, supra, the United States Court of Appeals for the Eighth Circuit determined that there was no implied federal cause of action for uninsured flood damage sustained by a home mortgagor, even though the mortgagee bank had not given the federally required notice of flood hazard and had not required the purchase *245 of flood insurance. In determining that borrowers were not a special class for whose benefit the federal legislation required flood-hazard notification and the purchase of flood insurance, the Hofbauer court observed:
"The specific statutes in question were not enacted for the special benefit of the borrowers. Section 4012a(b) requires flood insurance for the amount of the outstanding loan balance and not for the equity of the borrower. If Congress had passed the statute primarily for the benefit of the borrowers, it would have required that they insure their equity in the home. This statute seems primarily concerned with protecting lenders, not borrowers."
700 F.2d at 1200.
As noted previously, the federal requirement that flood insurance be purchased for an amount at least equal to the amount of the outstanding loan balance, with no concomitant requirement that borrowers also insure the equity in their homes, does not imply any congressional intention to prevent the lender and borrower from contractually agreeing that there should be insurance coverage for that equity. For all that appears in the opinions in Norris, Mid-America, and Hofbauer, there was no counterpart provision in the mortgages involved in those cases to the one involved in this case, pursuant to which the Custers agreed to keep the property insured against loss "by fire or other hazards, casualties and contingencies in such amounts ... as may be required by the Mortgagee" and further agreed that the mortgagee could force-place such insurance if the Custers failed to obtain it themselves.
This Court looks to federal court decisions as an aid in interpreting federal statutes when there is federal caselaw on point. J.C. Bradford & Co. v. Vick, 837 So.2d 271 (Ala.2002). However, the parties have not cited any applicable federal authority discussing the meaning of 42 U.S.C. § 4012a(b) as it relates to the Custers' claims, and our research has unearthed no authority on point. Likewise, the parties have cited no relevant state-court holdings. Therefore, as we would do anyway as the first step in construing a statute, we focus on the language of the statute.
"When a court construes a statute, `[w]ords used in [the] statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says.'" Lyons v. Norris, 829 So.2d 748, 751 (Ala.2002) (quoting IMED Corp v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)). See also Ex parte Alabama Dep't of Mental Health & Retardation, 840 So.2d 863 (Ala.2002); Bassie v. Obstetrics & Gynecology Assocs. of Northwest Alabama, P.C., 828 So.2d 280 (Ala.2002); City of Orange Beach v. Benjamin, 821 So.2d 193 (Ala.2001). As stated earlier in the opinion, the critical language in 42 U.S.C. § 4012a(b)(1) requires flood insurance "in an amount at least equal to the outstanding principal balance of the loan." (Emphasis added.) That qualified phrasing is reiterated by the requirement in § 4012a(e) that the borrower be notified of his obligation to obtain flood insurance that is "not less" than the amount required by subsection (b)(1). "A statute must be considered as a whole and every word in it made effective if possible." Alabama State Bd. of Health v. Chambers County, 335 So.2d 653, 654-55 (Ala.1976), citing State By and Through State Board for Registration of Architects v. Jones, 289 Ala. 353, 267 So.2d 427 (1972). See also Hawkins v. Louisville & Nashville R.R., 145 Ala. 385, 40 So. 293 (1905). The construction *246 given to § 4012a(b)(1) by the court in Norris did not accord any meaning to the phrase "at least" appearing in that section. We conclude that it is appropriate in construing 42 U.S.C. § 4012a(b) to give that phrase meaning. "`At least' means a minimum of and must be at least equalled. Something substantially equal is not enough." Hall v. Dawson, 429 S.W.2d 366, 368 (Ky.1968).
"`At least' is an adverbial phrase meaning at the lowest estimate; at the smallest concession or claim; in the smallest or lowest degree; at the smallest number; and sometimes used in the sense of clearly. It is a phrase of emphasis, expressive of a minimum, and implies the possibility of more."
Barron v. Green, 13 N.J.Super. 483, 485-86, 80 A.2d 586, 587 (1951) (emphasis added). See also Schmeckpeper v. Panhandle Co-op. Ass'n, 180 Neb. 352, 143 N.W.2d 113 (1966); Santow v. Ullman, 39 Del.Ch. 427, 434, 166 A.2d 135, 139 (1960) ("In any event the sufficient answer is that the natural import of the phrase `at least' is... to express the idea of a minimum and nothing more") (emphasis added). Based on the language of § 4012a(b)(1)"at least equal to the outstanding principal balance of the loan"and the language of § 4012a(e)(1)"not less than the amount under subsection (b)(1)"we conclude that the NFIA establishes that the minimum, not the maximum, amount of flood insurance coverage that may be force-placed on a mortgagor by a mortgagee is that amount equal to the outstanding principal on the mortgagor's loan. We therefore decline to adopt the rationale of Norris.
As earlier stated, the outstanding principal on the Custers' loan at the time Homeside force-placed flood insurance on the mortgaged property was approximately $2000. Therefore, the minimum amount of flood insurance that Homeside could have force-placed on the Custers' property was $2000. Homeside force-placed flood insurance in the amount of $79,000. In so doing, Homeside satisfied the minimum force-placement requirements of the NFIA. Contractually, it was given the right to force-place a higher amount, under the provisions of the mortgage authorizing it to force-place insurance against loss "in such amounts" as it might choose to require.
We next consider whether the terms of the mortgage agreement between Homeside and the Custers concerning the amount of insurance that might be required by Homeside permitted Homeside to force-place flood insurance in the amount of $79,000. Under Alabama law, mortgage agreements are enforced as written, barring some contravention of public policy. For example, in Hampton v. Gulf Federal Savings & Loan Association, 287 Ala. 172, 249 So.2d 829 (1971), the mortgagor sued the mortgagee, alleging that the mortgagee had failed to insure the mortgaged property, after the mortgagee instituted foreclosure proceedings, in an amount equal to the value of the mortgage, as had been done in the past by the mortgagor. The mortgage agreement obligated the mortgagor "[t]o continuously maintain hazard insurance, of such type or types and amounts as [the] Mortgagee may from time to time require," 287 Ala. at 174, 249 So.2d at 830. The Hampton Court stated:
"Under the language of the mortgage, the right of [the mortgagee] to fix the amount of the insurance was absolutely discretionary at any time. It had the right to determine, unilaterally, the amount of the insurance and even had the right under the provisions of said mortgage to reduce the coverage to zero."
*247 287 Ala. at 176, 249 So.2d at 833. The Court also stated:
"Here, the language of the mortgage confers upon the mortgagee complete discretion pertaining to the amount of insurance and the right to change such amount `from time to time.' Therefore, this court holds that under the language of the mortgage, [the mortgagee] was under no duty to keep the insurance on the mortgaged property in the amount previously maintained."
287 Ala. at 176-77, 249 So.2d at 833. In light of the terms of the mortgage agreement in this case,[13] and applying this Court's holding in Hampton, we conclude that Homeside did not breach the terms of the mortgage agreement between it and the Custers by force-placing flood insurance in an amount that exceeded the outstanding principal on the Custers' loan.
In addition, we note that the Custers were notified by Homeside on three separate occasions that their property was subject to the force-placement of flood insurance. Contained in one of those notices was a statement that the amount of insurance Homeside intended on force-placing on the Custers' property in the event they did not procure flood insurance on their own would be $79,000, the amount eventually implemented. The Custers were also informed that they could procure flood insurance from their personal insurance agent at a cost that might be "significantly" less than the cost of any such insurance if Homeside purchased it. Although the Custers did contact their personal agent in an attempt to procure flood insurance after they were contacted by Homeside, they did not take steps necessary to ensure that their agent followed through with their request to obtain the required insurance within the 60-day time limit imposed by Homeside, which, in turn, exceeded the 45-day time limit prescribed by 42 U.S.C. § 4012a(e)(2). The Custers knew that they had the option of obtaining their own flood insurance, and they failed to exercise that option.
The Custers further contend that the trial court's ruling allows a mortgagee to force-place insurance on a mortgagor's property in an amount that exceeds the mortgagee's insurable interest, thereby creating a wagering contract.[14] "[W]hatever furnishes a reasonable expectation of pecuniary benefit from the existence of the subject of insurance is a valid insurable interest." Pacific Nat'l Fire Ins. Co. v. Watts, 266 Ala. 606, 610, 97 So.2d 797, 801 (1957). "`Whoever ... may fairly be said to have a reasonable expectation of deriving pecuniary advantage *248 from the preservation of the subject-matter of insurance, whether that advantage inures to him personally or as the representative of the rights or interests of another, has an insurable interest.'" American Equitable Assur. Co. of New York v. Powderly Coal & Lumber Co., 221 Ala. 280, 282, 128 So. 225, 226 (1930) (quoting American Ins. Co. v. Newberry, 215 Ala. 587, 112 So. 195, 196 (1927)). "A mortgagor and a mortgagee each have an independent insurable interest in the property covered by the mortgage, and both interests may be covered by one policy." 3 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 42:28, at p. 42-35 (3d. ed.1997).
In this case, the insurable interests of both Homeside and the Custers were covered by the flood-insurance policy WNC obtained on behalf of the Custers. In their brief, the Custers acknowledge that any proceeds payable on the policy in excess of the amount owed to Homeside would be paid to them, stating: "To be sure, any proceeds from a force placed flood policy over and above the loan balance would be paid to the mortgagor." Homeside was acting as the Custers' agent to the extent it procured coverage for their equity interest in the property; Homeside had no incentive to injure or destroy the property (to the extent that a flood could be precipitated by human means), because all insurance proceeds over the loan balance, whatever they might be at any given time, indisputably would go to the Custers. Homeside's interest in the property was, in turn, protected only to the extent of the outstanding loan balance. Thus, while Homeside did insure the Custers' property in a manner that exceeded its insurable interest, it did so pursuant to contractual terms agreed to by both it and the Custers, and it did not insure the property in an amount that exceeded the total insurable interest in the property. We cannot conclude that Homeside's procurement of insurance designed to cover both its and the Custers' respective insurable interests represented an invalid wagering contract.
The Custers also argue that they are third-party beneficiaries to the "servicing agreement" between Homeside and WNC. In support of their argument, the Custers refer the Court to Holley v. St. Paul Fire & Marine Ins. Co., 396 So.2d 75 (Ala.1981). In that case, this Court, after considering the surrounding circumstances of the parties to the contract, as allowed by Anderson v. Howard Hall Co., 278 Ala. 491, 179 So.2d 71 (1965), and Zeigler v. Blount Brothers Construction Co., 364 So.2d 1163 (Ala.1978), concluded that a complainant could be a third-party beneficiary to a contract even though the complainant was not specifically considered in the contract.
To establish a claim of third-party-beneficiary entitlement, a claimant must show: "`"(1) that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party; (2) that the complainant was the intended beneficiary of the contract; and (3) that the contract was breached."'" H.R.H. Metals, Inc. v. Miller, 833 So.2d 18, 24 (Ala.2002) (quoting McGowan v. Chrysler Corp., 631 So.2d 842, 848 (Ala. 1993)). At the outset, we note that the Custers have not shown how the servicing agreement between Homeside and WNC, as opposed to the "Policy of Insurance Contract," applies to their case, in light of the fact that the Custers' policy was force-placed under the latter agreement.
Even assuming that the servicing agreement has some application, however, we note that the Custers have presented arguments in support of this theory only as to the first two prongs of third-party-beneficiary status. They do not argue or explain *249 in either their principal brief or their reply brief how the servicing agreement between Homeside and WNC was breached; our review of the evidence does not reveal any breach of that agreement. Further, the servicing agreement deals only with the discretion of Homeside to protect its interestthe agreement is neutral as to whether Homeside may force-place flood insurance in an amount that protects not only its interest but also that of the borrower. Because of the neutrality of the agreement on that point, we cannot conclude that on its face the agreement was intended to confer a benefit on borrowers. "[T]he court's inquiry may stop when it determines from the face of the contract that the parties did not intend to confer upon the third person a direct benefit." Collins Co. v. City of Decatur, 533 So.2d 1127, 1132 (Ala.1988).
Additionally, because Homeside had the contractual right under the mortgage agreement to exercise its discretion in deciding whether to insure a mortgaged property only to the extent of its interest in the property, or to insure also the borrower's interest, any benefit received by the Custers would have been merely incidental, thereby precluding a third-party-beneficiary claim. Stacey v. Saunders, 437 So.2d 1230 (Ala.1983) (plaintiffs were not third-party beneficiaries of an antenuptial agreement entered into by their mother and her intended husband with respect to a trust designed to pay the wife income for her life and give her "`a power to appoint by will to her estate, or to such persons as she may elect, the entire corpus and any undistributed income of the trust.'" 437 So.2d at 1232. In refusing to recognize the plaintiffs as third-party beneficiaries of that provision, this Court reasoned, "[a]ny benefit to Plaintiffs was, if anything, merely incidental, and depended solely upon [their mother's] discretionary power of appointment by will." 437 So.2d at 1233.). We conclude that the Custers did not satisfy the requisite elements of their third-party-beneficiary claim. Accordingly, the trial court did not err by entering a summary judgment for Homeside as to the Custers' third-party-beneficiary claim.
Consequently, the trial court's judgment is affirmed in all respects. Because we hold that the trial court did not err by entering a summary judgment for Homeside on all of the Custers' claims, we need not address the issue of class certification.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
MOORE, C.J., and BROWN and STUART, JJ., concur.
SEE, J., concurs in the rationale in part and concurs in the result.
SEE, Justice (concurring in the rationale in part and concurring in the result).
I concur with the main opinion that the mortgage agreement provided that the lender was entitled to determine the types and amounts of hazard insurance the Custers were required to keep on the property, and that the lender could force-place insurance if the Custers failed to adequately insure the property. The National Flood Insurance Act ("the NFIA") does not prohibit private parties from making and enforcing such an agreement in an amount that exceeds the lender's exposure. See 42 U.S.C. § 4012a. I, therefore, do not reach the question whether the NFIA affirmatively authorizes a mortgage lender to force-place flood insurance in an amount greater than the lender's exposure in a mortgage.
NOTES
[1] The National Flood Insurance Act, 42 U.S.C. § 4001 et seq., requires homeowners with mortgages on property in designated flood zones to carry flood insurance on that property. It also authorizes a mortgagee, in the event the mortgagor fails to procure flood insurance on his or her own accord, to obtain flood insurance for the mortgaged property and to charge the cost back to the mortgagor, thereby "force-placing" the insurance.
[2] The audit services performed by WNC consisted of WNC's monitoring Homeside's loan portfolio to determine when and if particular Homeside properties came within a "special flood hazard area," as identified by the Federal Emergency Management Agency, thereby requiring flood insurance under the National Flood Insurance Act.
[3] WNC is not a party to this appeal.
[4] Neither the Custers nor Homeside defines "binder." However, Couch On Insurance defines a binder as "a written contract by a duly authorized agent of an insurance company recognizing liability on a forthcoming contract during negotiations for such contract." 1 Lee R. Russ & Thomas F. Segalla, Couch On Insurance § 13.1, p. 13-5 (3d ed.1997) (footnote omitted). A binder acts as temporary insurance upon the application for insurance or the payment of the first premium that insures the applicant during the insurance company's investigation of insurability. Id. at p. 13-2.
[5] Under this servicing agreement Sterling conducted audits of Homeside's loan portfolio to determine if any of the properties in the portfolio required flood insurance.
[6] The record does not specifically state the date on which Sterling notified WNC that the Custers' property was in an SFHA; however, as Ofelia Chuante testified, WNC is notified electronically when Sterling sends its first letter to a borrower.
[7] 42 U.S.C § 4012a(e)(1) requires the lender to notify the borrower that the borrower should, at his or her own expense, procure flood insurance on the borrower's property when that property is identified by the director of the Federal Emergency Management Agency as being within an SFHA.
[8] The record does not indicate what changes might have occurred to cause the property's reclassification so that it was within an SFHA.
[9] 42 U.S.C § 4012a(e)(2) allows a mortgagee to force-place flood insurance, and to charge the cost of the insurance to the mortgagor, if the mortgagor fails to procure such insurance within 45 days of its being notified of the need for the insurance, as required under 42 U.S.C § 4012a(e)(1).
[10] The record does not provide an explanation for the discrepancy in the amount of premiums that had accrued as per Homeside's August 4, 1999, notice and the amount the Custers paid on or about September 27, 1999, to satisfy the loan.
[11] Pursuant to 44 C.F.R. § 61.6, the maximum amount of coverage the NFIA permits for a single-family residence under the National Flood Insurance Program, a federally subsidized program that provides flood insurance, is $250,000. The NFIA does not, however, establish a maximum for insurance not "made available under the Act," i.e., not purchased as part of the National Flood Insurance Program.
[12] Only paragraph (1), which has been previously quoted, is applicable to the present facts.
[13] We note that the mortgage contract in this case specifically permits Homeside to require insurance for loss against "other hazards," "other casualties," and "other contingencies," terms the Custers do not contend would not include floods. See also Weninegar v. S.S. Steele & Co., Inc., 477 So.2d 949 (Ala.1985); Jefferson County v. Johnson, 333 So.2d 143 (Ala.1976); and Law v. Gulf States Steel Co., 229 Ala. 305, 156 So. 835 (1934)(cases discussing floods as "hazards").
[14] "A wager policy of insurance has been defined as a pretended insurance where the insured has no interest in the insured subject and cannot sustain any loss by the happening of the misfortunes insured against." 43 Am. Jur.2d Insurance § 939 at 964 (1982) (footnote omitted).

"[T]he reason for the rule most commonly assigned is that if the insured has no insurable interest in the property insured, the insured is wagering that a loss or damage will occur and the insurer is wagering that it will not, thereby supplying the insured with an incentive to injure or destroy the insured property, which is against public policy."
National Sec. Fire & Cas. Co. v. Brannon, 47 Ala.App. 319, 324, 253 So.2d 777, 781 (1971); Brewton v. Alabama Farm Bureau Mut. Cas. Ins. Co., 474 So.2d 1120 (Ala.1985).